(No. 86-CC-0496—

STANLEY JUREK, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Order filed December 27, 1996.*

*Order on petition for rehearing filed June 12, 1997.*

MICHELOTTI & ASSOCIATES, for Claimant.

JIM RYAN, Attorney General (PAUL H. CHO and ANDREW LEVINE, Assistant Attorneys General, of counsel), for Respondent.

## ORDER

MITCHELL, J.

This cause comes before the Court on Claimant's complaint alleging that Respondent, State of Illinois, was negligent. Specifically, the Complaint alleges that on September 26, 1984, while Claimant was waiting in his cell, an unknown person or persons threw liquid containing bleach and scalding hot water upon his face and chest. The complaint alleges that on September 23, 1984, Claimant requested to be placed in protective custody, due to threats from other prisoners and as of the date of the incident, had not been placed in protective custody. In essence, Claimant complains that Respondent failed to provide proper security to protect him.

A hearing was conducted on August 10, 1995, at which Claimant appeared and testified. Respondent presented one witness. The parties stipulated that the language contained in Claimant's exhibit No. 1 states the rules and regulations in effect on protective custody at the time of the incident.

### I. Testimony of Stanley Jurek

Mr. Jurek testified that in September of 1984, he was incarcerated at Menard Correctional Center (hereinafter referred to as "MCC") and was in the south house. In September of 1984, a prisoner came to his cell and told him there was going to be a war and he needed Claimant to make a knife from a piece of metal, known as a "shank." He had never seen him before. He identified himself as affiliated with the north side gang. Mr. Jurek told him he would not make a shank. That night the whole cell house was full of grinding sounds. Other inmates told him that day that there would be repercussions if he did not make the shank. They said something would happen to him. He had seen these prisoners before. He took their threats seriously.

Mr. Jurek called for a guard immediately and told him that he was being threatened and wanted to be placed in protective custody immediately. At this time no one was in his cell. He asked the guards several times to be put in protective custody. Finally, he was double-locked in his cell. When a cell is double-locked, it will not open automatically with the other cells. While double-locked in his cell, the guard let someone in the cell. Claimant complained to the guard that no one was to be added to his cell because he was on "pc lockdown." That particular prisoner was let out of his cell at lunchtime.

Mr. Jurek was not allowed to go out of his cell. His meals were brought to him and served on a tray passed through the bars. When he went to grab for the meal, somebody came by and threw hot bleach in his face. It was extremely painful. Although the person was right in front of his cell, Claimant does not believe he can identify him.

His face, neck and shoulders were touched by the bleach and his skin was rolling off his face. A guard escorted him to the hospital. He was bandaged at the hospital. He was out of the hospital within a couple of hours. He was taken to an office. He was taken to minimum security. The bandages were on for several weeks and were replaced a couple of times. He was not placed in the protective custody area until after September.

Claimant identified Claimant's exhibit nos. 2-A and 2-B as photographs taken of him in the visitors room. He knows they were taken after the incident, he does not know exactly when.

On cross-examination, Mr. Jurek stated that the person who asked him to make a shank was white. He is sure the person told him he was in the north side gang, "at one time or another." He may or may not have told him this at the time of the "shank" conversation. He knew he was in

the north side gang. He was not sure of the exact date of the "shank" conversation, and believes the hot bleach was thrown in his face the next day.

The prisoner who asked him to make the shank told him there would be repercussions if he did not make it. He did not explain what he meant. When he told the guards about the incident, they told him they needed a captain or lieutenant to authorize protective custody. Although he was still in general population, his cell was double-locked. There were no problems between him and the inmate that was placed in his cell for a couple of hours.

There was only one person who threw the bleach. He did not see the person because his meal was being handed to him through the bars. He does not know who it was. He knows it was not the person who had the "shank" conversation the prior day because that person was "a chief in a gang."

He was questioned, but could not identify the attacker. He thinks the bandages were on for a couple of weeks and the photographs were taken in September.

On redirect, Claimant testified that he could identify the person who had the shank conversation as a gang member because of his clothes.

Claimant's exhibit nos. 2-A and 2-B were admitted over Respondent's objections. Claimant's exhibit No. 3, medical records, were admitted without objection.

## II. Testimony of Boniface Grace

Respondent presented Correctional Superintendent Boniface Grace. He was shift captain at MCC at the time of the incident. He stated that protective custody is for inmates that want to be separated from general population. When an inmate requests protective custody, he is seen by the assignment committee. If the assignment committee

recommends protective custody, the inmate must await approval by the chief administrative officer. There is a protective custody unit, separated from general population. He described "protective custody deadlock" as a situation when an inmate requests protective custody and there is no room in the protective custody unit intake gallery. The intake gallery is separate from the protective custody unit. When there is no room at the intake gallery, they deadlock the cell. The inmate stays deadlock until the inmate has seen the assignment committee, he is not considered to be in protective custody.

He identified Respondent's exhibit No. 1 as an incident report that he signed. Respondent's exhibit No. 1 was admitted into the record without objection.

### III. Arguments

Claimant argues that Respondent was put on notice and had a duty of reasonable care toward Claimant. When an inmate requests protective custody, he must be promptly taken away from general population and put into protective custody. Claimant's complaint does not request any specific dollar amount for damages and Claimant did not argue for any specific dollar amount of damages in his closing argument.

Respondent argues that it is not an insurer of the safety of inmates. Claimant has failed to show that the harm was foreseeable.

No briefs have been received.

### IV. Summary

The parties agree that the State is not an insurer of an inmate's safety. The parties also agree that the State must act reasonably in caring for the inmates' safety. (*Dorsey v. State* (1977), 32 Ill. Ct. Cl. 449.) The difference is that Claimant contends that the State breached its

duty of reasonable care by not removing Claimant from general population and placing him in the protective custody unit within what appears to be a time period of 24 hours within his oral request for protective custody. Section 501.320(a) of chapter 20 of the Illinois Administrative Code, specifies, *inter alia*, that:

"The employee to whom such a request is made shall promptly notify the Chief Administrative Officer or his designee. Reassignment from the general population to protective custody shall be accomplished as expeditiously as possible."

Respondent's exhibit No. 1 indicates that there was no room in the protective unit and that at the time of the incident, Claimant was on protective custody deadlock.

This case is similar to *Butler v. State* (1994), 46 Ill. Ct. Cl. 416. In *Butler*, an inmate complained about fear of a further attack and was placed in lockdown, or temporary protective custody, for three days. (46 Ill. Ct. Cl. at 417.) He was never directly threatened with bodily harm by the inmate who ultimately attacked him. He did not give the guards the name of the inmates he suspected were going to attack him. The Court found that the Respondent's agent took steps to protect the claimant.

In the case at bar, it is clear from his testimony that Claimant recognized, or could have recognized, the person who initially had the "shank" conversation with him. He also said other prisoners told him of possible repercussions. Yet, he reported no names or otherwise attempted to identify the first individual, or others. The record indicates that Respondent's agents took steps to provide a higher degree of protection for Claimant prior to the incident.

The Court finds that Claimant has not established by a preponderance of the evidence that Respondent breached its duty of reasonable care. This is based upon the record establishing that Respondent took action the

same day that Claimant requested, *i.e.*, placing the Claimant on protective custody deadlock, which was one day prior to the incident. The Claimant has not established that under these circumstances he should have been removed from general population prior to the incident or that Respondent otherwise breached its duty of reasonable care.

The claim is hereby denied.

## ORDER

MITCHELL, J.

This matter comes before the Court on Claimant's motion for rehearing. The Court having reviewed the entire file and the applicable law reiterates that the Claimant has failed to establish by a preponderance of the evidence that the Respondent breached its duty of reasonable care. Therefore, Claimant's motion for rehearing is denied and the original order dated December 27, 1996, is affirmed.